**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ESTATE OF BIRENDRA THAKURI, by and through its personal representative SANU
THAKURI,

      Plaintiff,

v.

CITY OF WESTMINSTER, and
STEVEN BARE, in his individual capacity,

      Defendants.

_____

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**
_____

      Plaintiff the Estate of Birendra Thakuri (the Estate), through its attorneys, Gail K.
Johnson, Eric K. Klein, and Aurora L. Randolph of Johnson & Klein, PLLC, hereby
submits this Complaint alleging violations of Mr. Thakuri's federal constitutional and
statutory rights.

## I.     INTRODUCTION

      1.     Sanu Thakuri is a single mother who spent her entire life working to create
a better life for her two sons, Surendra and Birendra Thakuri.  This quest for a better life
led Ms. Thakuri to immigrate from Kathmandu, Nepal, to Colorado.  She brought her
sons to the United States in 2006, when they were teenagers.

2.      Ms. Thakuri raised her sons to be vibrant and successful members of the Broomfield community, making deep connections with several churches in the area and continuing to raise money for an orphanage in Nepal that the family has long supported.

3.      Unfortunately, in March 2018, Birendra was diagnosed with bipolar disorder, and in the ensuing months he was battling significant mental-health problems.

4.      Like many members of the Colorado community, Ms. Thakuri struggled to find the help for Birendra that he so desperately needed.  Ms. Thakuri, trusting and grateful, frequently called police officers in an effort to help her obtain care for Birendra.

5.      But instead of providing that help, one of those police officers ultimately violated his position of trust by extinguishing the bright life of Ms. Thakuri's precious younger son, Birendra.

6.      On August 25, 2018, Defendant Officer Steven Bare of the Westminster Police Department (WPD) responded alone to a police broadcast about a 9-1-1 call reporting an alleged fight among three individuals.  Arriving at the area, Defendant Bare came upon two young men—Birendra and Surendra—kneeling in the grass and facing each other near Federal Boulevard in Westminster.

7.      Birendra—deeply upset and suffering from a mental-health crisis— immediately began acting strangely: screaming unintelligibly, slapping his own head, pacing, flailing his arms, and even rapidly approaching and retreating from Defendant

Bare for no apparent reason. As Defendant Bare himself described it, Birendra appeared "emotionally disturbed."

8. Despite a range of other, non-lethal options for addressing a young man clearly having a mental-health crisis, Defendant Bare drew his gun and fired one shot, killing 27-year-old Birendra Thakuri on that roadside.

9. This fatal shooting is just one among many civilian deaths caused by WPD officers in 2018. Birendra Thakuri's death resulted from a pattern of deliberate indifference to the lives of civilians in Westminster and a failure to adequately train police officers how to respond to people experiencing mental-health crises.

## II.    JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act 1973, 29 U.S.C. §§ 701-794. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting the Estate's claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794.

11. Venue in the District of Colorado is proper under 28 U.S.C § 1391(b) because all of the events relevant to the claims contained herein occurred in the State of Colorado.

### III.   PARTIES

12.     At all times relevant to this Complaint, the decedent Birendra Thakuri was a citizen of the United States and a resident of the State of Colorado.

13.     Plaintiff Sanu Thakuri, personal representative of the Estate of Birendra Thakuri, was Birendra Thakuri's mother.  Ms. Thakuri is a resident of Broomfield, Colorado.  At all times relevant to this Complaint, she was a resident of the State of Colorado.  She represents the interests of the Estate.

14.     Defendant City of Westminster is a Colorado municipality.  Defendant City of Westminster is responsible for the oversight, supervision, and training of the Westminster Police Department (WPD) and its officers.  Defendant City of Westminster was at all relevant times the employer of Defendant Officer Steven Bare.  At all times relevant to this Complaint, Defendant City of Westminster was receiving federal financial assistance.  The WPD received some of this federal funding.

15.     At all times relevant to this Complaint, Defendant Officer Steven Bare was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in his capacity as a law-enforcement officer employed by Defendant City of Westminster.

## IV.    FACTUAL ALLEGATIONS

**A.    The Life and Family of Birendra Thakuri**

16.    Birendra Thakuri was born in Kathmandu, Nepal, on November 16, 1990, to Sanu and Bikram Thakuri.

17.    Birendra grew up very close to his older brother, Surendra Thakuri.  The Thakuri boys attended their early school years in Nepal.

18.    In 1991, their mother, Sanu Thakuri, was the victim of a near-fatal gas explosion in Nepal and suffered burns on more than 65% of her body.  In 2000, Ms. Thakuri came to the United States for medical treatment, and in 2001, she moved permanently to Boulder, Colorado, while her sons were in boarding school back in Nepal.

19.    For five long years, Ms. Thakuri worked through the protracted immigration process to bring her boys to Colorado.  In 2006, Ms. Thakuri was finally able to bring Surendra and Birendra to the United States, and the boys very proudly became United States citizens a few years later.  She hoped to give them a better life.  Ms. Thakuri donated her home in Nepal so that it could become an orphanage.  Ms. Thakuri and her sons worked with churches in the Westminster area both to raise funds for



the orphanage and to support Colorado individuals in need.

20.    Ms. Thakuri, Surendra, and Birendra were very close as a family, spending much of their time together.  At the time of Birendra's death, they all lived together in a house Ms. Thakuri owned in Broomfield, Colorado.

21.    Birendra was a much-beloved member of the Nepali and Front Range communities in Colorado.

22.    Birendra graduated from Centaurus High School and had worked at First National Bank in Boulder.  He enrolled in classes at Metro State University, hoping to eventually obtain a business degree, and he helped start a group in Colorado for Nepalese youth.

23.    Birendra loved riding his mountain bike, playing the guitar, and spending time with the members of his church.  He had plans and dreams of one day starting his own business.

**B.    Birendra's Struggle with Mental Illness**

24.    Unfortunately, Birendra also struggled with episodes of significant mental illness.  Before his death, Birendra was diagnosed with bipolar disorder.

25.    As part of his mental illness, Birendra experienced paranoia, severe anxiety, and delusions.

26.    Birendra received help and counseling from Mental Health Partners in Lafayette, Colorado.

27.     During the year preceding Birendra's death, Ms. Thakuri, who was concerned about Birendra's mental-health issues, called the Broomfield Police Department (BPD) several times seeking their help.

28.     Indeed, shortly after 12:00 a.m. on August 24, 2018—the day before he was fatally shot—Ms. Thakuri called the BPD to report her concern that Birendra had not taken his medication and was having a "mental episode." Ms. Thakuri begged the BPD to place Birendra on a mental-health hold.

29.     At 1:09 p.m. on August 24, 2018, the BPD entered an "Attempt-to-Locate" (ATL) for Birendra in the Colorado Crime Information Center (CCIC) (excerpted below). BPD included in the ATL a physical description of Birendra and a summary of his current mental-health crisis ("SUBJECT IS OFF HIS MEDS AND IS MAKING SUICIDAL STATEMENTS // HE BELIEVES HE IS BEING FOLLOWED"):

```
***WARNING - DO NOT ARREST BASED ON THIS INFORMATION***
MKE/ATTEMPT TO LOCATE WANTED PERSON
RTY/ATL ATTEMPT TO LOCATE
CIC/123069397
ORI/CO0640100 BROOMFIELD POLICE DEPARTMENT
NAM/THAKURI,BIRENDRA SEX/M RAC/U
DOB/19901116
HGT/507 WGT/165 EYE/BRO HAI/BLK
SOC/█████████
NOA/Y
MIS/ATL ONLY // SUBJECT IS OFF HIS MEDS AND IS MAKING SUICIDAL STATEMENTS
    // HE BELIEVES HE IS BEING FOLLOWED // IF IN CONTACT PLEASE CHECK
    WELFARE AND ADVISE OFFICER OSBORNE AT 3034386400
```

30.     The CCIC is a computerized information system used to provide information to Colorado criminal justice agencies.

31.     On information and belief, WPD officers and 9-1-1 dispatchers use CCIC in their policing duties.

32.     On information and belief, when he was on duty, Defendant Bare should and would review outstanding ATLs active in his area, including those issued by the BPD.

33.     On information and belief, this ATL regarding Birendra was still active at the time he was killed.

## C.    The Day of the Shooting

34.     The next day, on August 25, 2018, around 5:00 a.m., Birendra awoke the members of his family, yelling about his disturbing dreams and his belief that there were people trying to kill him.  Birendra then left the family home, and Surendra followed him.

35.     Around 10:30 a.m. that same day, Ms. Thakuri again called the BPD regarding her concern for Birendra.  She reported that Birendra had returned home early that morning but was having a "breakdown" and had again left her house with his brother.  Ms. Thakuri was concerned because Birendra had said he wanted to kill himself.  Ms. Thakuri told the BPD that Birendra had no weapons.  She described what he looked like and the clothes he was wearing.

36.     About an hour later, on August 25, 2018, around 11:30 a.m., BPD Officer Jason Collins located the Thakuri brothers and spoke with them.  Officer Collins did not place Birendra into custody, but the BPD notified the "Early Diversion, Get Engaged"

(EDGE) Mental Health Group about this encounter and about Birendra's mental-health problems.

37.     The EDGE Mental Health Group is a law-enforcement and behavioral health co-response program that aims to prevent unnecessary incarceration and hospitalization of individuals with behavioral health issues by diverting such individuals into treatment instead of jail and reducing the likelihood of violent encounters with law enforcement.  EDGE Mental Health Group is a partnership between Mental Health Partners and the City and County of Broomfield.

38.     The EDGE Mental Health Group did not contact any of the Thakuris before Birendra's death later that day, apparently because it was the weekend.

39.     After speaking with BPD Officer Collins, the Thakuri brothers wandered around town for a few hours before returning home.

40.     On August 25, 2016, at around 1:00 p.m., Ms. Thakuri, who worked overnight shifts as a home healthcare provider, left the house to go to her work.  Shortly thereafter, the Thakuri brothers returned to the family home.  They had lunch with Surendra's wife, Pratima Thakuri, and then left the house again around 4:00 p.m.

41.     For the next several hours, the brothers walked around Broomfield and Westminster, stopping at several stores.

**D.     The Fatal Shooting of Birendra Thakuri**

42.     As the evening of August 25, 2018, progressed, Birendra became increasingly erratic and visibly upset.  He told Surendra he thought he had been poisoned,

he was hearing things, and he had a headache. At the last store the brothers visited, Birendra paced around holding his head in his hands. Surendra was concerned and did not know how to help his brother.

43.     That night, at around 8:30 p.m., Birendra and Surendra Thakuri were walking through Westminster, talking as they made their way back to their home in Broomfield.

44.     During their walk home, around the 114th block of Federal Boulevard, the brothers had a scuffle with each other because, despite traffic, Birendra repeatedly started walking into Federal Boulevard. Surendra was attempting to protect him by getting him out of the street, but Birendra was in the midst of a mental-health crisis and could not listen to reason. As Surendra tried to calm Birendra down, Birendra yelled at Surendra.

45.     A few seconds later, the brothers came out of the street and kneeled in the grass beyond the sidewalk, speaking to each other. Birendra was still upset, putting his hands on his head, yelling, ripping at the grass, and putting some of the torn grass into his mouth.

46.     During the brothers' scuffle, at 8:45 p.m., Westminster resident Fadi Sawaged called 9-1-1 to report what he thought was a fight between the brothers. He told the operator he could see three men fighting and that he heard shouting and moaning.

47.     WPD aired a dispatch message saying there was a disturbance near that location, with a report of three men fighting.

48.    Neither the 9-1-1 caller nor the dispatcher said there were weapons present or even suspected to be present.

49.    Within 30 seconds of the airing of the dispatch message about the 9-1-1 call, Defendant Bare responded to the scene—alone—despite the fact that at least one other officer had broadcast that he was close and was already heading toward the area.

50.    A call regarding three people fighting is a call requiring a two-unit response from the police.

51.    Defendant Bare should have waited for backup and made plans to arrive with one or more other police officers in a coordinated fashion.

52.    Defendant Bare's decision to respond alone to the reported disturbance—three men fighting—unnecessarily created the potential two-on-one situation that he says caused him to feel vulnerable.

53.    Defendant Bare recklessly and needlessly created a situation in which he proceeded to feel unsafe, ultimately resulting in the death of Birendra Thakuri.

54.    On information and belief, by the time he encountered the Thakuri brothers, Defendant Bare was aware of the ATL about Birendra that discussed his mental-health issues.

55.    Defendant Bare pulled up to the two brothers with his search lights on and then turned on his vehicle's overhead lights.  Defendant Bare observed two men kneeling in the grass, facing each other.

56.     Defendant Bare did not wait for backup officers to arrive, but instead got out of his patrol vehicle, alone.

57.     Defendant Bare said nothing at this time and never identified himself to the brothers throughout their interaction.

58.     After a few seconds, Birendra stood up and started walking towards Defendant Bare.  Defendant Bare described this as "kind of weird."

59.     While Birendra was walking toward Defendant Bare, Birendra started "screaming unintelligibly" in a language Defendant Bare could not understand.  As Birendra approached Defendant Bare, Defendant Bare saw Birendra flailing his arms and slapping his head.

60.     Defendant Bare noted that Birendra was "clearly upset about something," but Defendant Bare did not know why.

61.     Defendant Bare said that at this point in their interaction, "it occurred to [him] that [Birendra] was emotionally disturbed."

62.     During this approach, Birendra was pointing at Defendant Bare's vehicle and screaming, which Defendant Bare thought was also "kind of weird."

63.     These behaviors should have signaled to Defendant Bare that the man approaching him may be in the midst of a mental-health crisis.

64.     WPD's Policy 301.23, "Responding to Persons Affected by Mental Illness or in Crisis," details potential signs of mental-health issues and procedures for responding

to an individual with them. The WPD Policy notes that symptoms of a person affected by mental illness or in crisis "may include ... emotional reactions such as fear, anger ... psychological impairments such as inability to focus, confusion, nightmares, and potentially even psychosis ... and/or behavioral reactions including the trigger of a 'fight or flight' response." This Policy lists abnormal behaviors someone with a mental illness may show, including "strong and unrelenting fear of persons, places, or things," "inappropriate behavior," "act[ing] extremely inappropriate for a given situation or exhibit[ing] out of the ordinary expressions of feelings," and "delusions of ... paranoia."

65.     Regarding situations involving individuals who officers believe to be in a mental-health crisis, the WPD Policy states: "The goal shall be to de-escalate the situation safely for all individuals involved when reasonable, practical, and consistent with established safety priorities."

66.     If law-enforcement intervention is required for someone suffering a mental health crisis, police officers should be trained that the following responses, among others, should be considered:

a)  request a backup officer;

b)  take steps to calm the situation;

c)  create increased distance;

d)  utilize environmental controls, such as barriers, to help manage the volatility of situations;

e)  ask the individual's name; and

f) communicate with the individual in an attempt to determine what is bothering them.

*See* International Association of Chiefs of Police: Law Enforcement Policy Center, *Model Policy: Responding to Persons Experiencing a Mental Health Crisis, Section IV* (August 2018).

67.　Defendant Bare repeatedly said that Birendra's behavior made no sense to him and "there was no explanation from what I saw for him to behave" in the way he was behaving.

68.　Defendant Bare did not see any weapons and did not claim that he thought Birendra or Surendra had any weapons.

69.　Given his observations of Birendra's unusual behavior and his perception that Birendra was "emotionally disturbed," Defendant Bare should have recognized the signs of mental-health crisis and distress, taken steps to calm the situation, calmly communicated with Birendra, gathered necessary information from Surendra, and attempted to extricate himself from the situation while waiting for backup.

70.　Instead, when Birendra first approached him, Defendant Bare merely yelled "stop" at Birendra, and Birendra complied with this order by stopping and returning back to his brother.

71.　At this point, Defendant Bare could have retreated back into the safety of his car to wait for backup, which he knew would soon arrive. Or he could have walked around to the other side of his car to place distance and time between him and Birendra.

72.    But Defendant Bare did neither of those things.

73.    After Birendra walked back to Surendra, the two brothers spoke to each other for several seconds in Nepalese.  Because Defendant Bare did not understand the Nepalese language, he jumped to the conclusion that they were "planning something."

74.    Defendant Bare did not even attempt to speak with Birendra or Surendra—both of whom spoke and understood English.

75.    Defendant Bare later admitted that after Birendra had complied with his command to stop and the brothers were speaking, Defendant Bare "already had this is in my mind that something is gonna happen and I was gonna have to fight these two guys."

76.    According to Defendant Bare, after Birendra spoke to his brother in Nepalese, he remained "animated," and turned and approached Defendant Bare a second time.  Defendant Bare claims Birendra was running and screaming, with his arms flailing.

77.    Again, given his ongoing observations of additional unusual behavior by Birendra and his perception that Birendra was "emotionally disturbed," Defendant Bare should have recognized the classic signs of a mental-health crisis.  This should have indicated to Defendant Bare that he was dealing with an individual with a disability and that he should act accordingly.

78.    Given that it was apparent Birendra was in the throes of a mental-health crisis, Defendant Bare should have taken steps to defuse the situation, calmly

communicated with Birendra, gathered necessary information from Surendra, and attempted to extricate himself from the situation while waiting for backup.

79.     Instead, Defendant Bare did not say anything, but merely took a few steps backwards.

80.     When Birendra got close to him, Defendant Bare swung his flashlight, striking Birendra in the face, and pushed Birendra backwards.

81.     When Defendant Bare hit Birendra in the face with the flashlight, Birendra retreated back to his brother a second time.

82.     The brothers again spoke to each other.

83.     Still, Defendant Bare did not even attempt to speak to the two young men.

84.     According to Defendant Bare, he "didn't have the presence of mind to issue challenges." Issuing challenges is also known as issuing commands.

85.     At this point, Defendant Bare did not take advantage of this additional opportunity to get into his car and wait for backup, or to use the vehicle as a barrier to increase the distance between him and Birendra in order to buy time for backup to arrive.

86.     According to Defendant Bare, after Birendra spoke with his brother after having been struck in the face with Defendant Bare's flashlight, Birendra turned around and charged towards Defendant Bare with his arms flailing, "agitated, animated, screaming."

87.     Defendant Bare took a few steps backward, but he did not circle around his police cruiser to create a barrier between himself and Birendra.

88.     Even though just moments earlier, Defendant Bare had used his flashlight to successfully repel Birendra's approach, this time, Defendant Bare did not use his flashlight.

89.     Even though Defendant Bare had Oleoresin Capsicum (OC) spray readily available to him in his utility belt, he did not use it.

90.     Even though Defendant Bare had a taser readily available to him in his utility belt, he did not use it.

91.     Instead of using any of these available alternative means of non-lethal force, Defendant Bare reached down to his utility belt, right past his OC spray and taser, and pulled out his gun.

92.     From a distance of about ten feet away, Defendant Bare then shot Birendra in the chest.  Birendra stumbled a little and then collapsed to the ground.  He later died from the gunshot wound inflicted by Defendant Bare.

93.     Defendant Bare has a visible tattoo (pictured here) that appears to spell out the phrase ΜΟΛΩΝ ΛΑΒΕ (mu omicron lambda omega nu lambda alpha beta epsilon) in letters of the Greek alphabet.



94.     This phrase means "come and take them," referencing the person's guns, and is commonly understood as a cultural symbol touted by extreme gun enthusiasts in a show of defiance in the face of a general perceived threat that one's guns are in danger of attempts at confiscation.

95.     Immediately after Defendant Bare shot Birendra, Surendra rushed to his brother's side, repeatedly wailing, "Why?"

96.     For the very first time, Defendant Bare spoke to Surendra, ordering him to get down on the ground.

97.     Surendra immediately complied with Defendant Bare's order and got to the ground in a prone position.  Defendant Bare then handcuffed Surendra.

98.     Defendant Bare then returned to Birendra and began trying to drag him out of the gutter and onto the grass to start administering CPR.

99.     Seconds later, several other WPD officers arrived on the scene, including WPD Officer Berzanji.

100.     Upon his arrival, Officer Berzanji helped Defendant Bare drag Birendra from the curb onto the grass.  According to Officer Berzanji, as they moved him, he heard gurgling and agonized breathing from Birendra.

101.     Birendra was taken by ambulance to Good Samarian Medical Center in Lafayette, Colorado, and was pronounced dead at 9:22 p.m. on August 25, 2018.

102.     During the entire interaction with Defendant Bare, Birendra was unarmed.

103.     During the entire interaction with Defendant Bare, Surendra was unarmed.

104.     At no time during his encounter with the Thakuri brothers did Defendant Bare believe he had observed Birendra with any weapon.

105.      At no time during his encounter with the Thakuri brothers did Defendant Bare believe he had observed Surendra with any weapon.

106.     At no time during his encounter with the Thakuri brothers did Defendant Bare believe he had observed Birendra reaching for any weapon.

107.     At no time during his encounter with the Thakuri brothers did Defendant Bare believe he had observed Surendra reaching for any weapon.

108.     At no time during this encounter did Birendra make any verbal threats of physical violence to Defendant Bare.

109. At no time during this encounter did Surendra make any verbal threats of physical violence to Defendant Bare.

110. At no time during this encounter did Birendra hit or injure Defendant Bare.

111. At no time during this encounter did Surendra hit or injure Defendant Bare.

112. Throughout this encounter, Birendra complied with the sole verbal command that Defendant Bare issued to him.

113. Throughout this encounter, Surendra complied with all verbal commands that Defendant Bare issued to him.

114. When Defendant Bare initiated the encounter with the Thakuri brothers, he did not witness them committing any crime. Based on the 9-1-1 report of men fighting, it is likely that even if they were going to end up being charged with a criminal offense, it would have been merely the municipal petty offense of "Disturbing the Peace," or—at most—a misdemeanor charge for simple assault.

**E.    The Thakuris' Terror Immediately Following the Fatal Shooting of Birendra**

115. Surendra—in a daze after having just seen his brother shot by a police officer at close range in front of him—was arrested by the WPD, thrown into their police car, taken away from his brother and transported to the police station, and questioned for hours.

116. During the hours Surendra was kept in the custody of the WPD, even though he asked questions about his brother, the WPD did not tell Surendra that Birendra was dead.

117. After questioning Surendra first in English and then again with a Nepalese interpreter, the WPD told him they were finished. The WPD then released Surendra in the middle of the night, in a daze, to wander the streets for hours before his family found him.

118. Surendra was not charged with any crime.

119. Meanwhile, around 11:00 p.m. on August 25, 2018, Ms. Thakuri again called the BPD, concerned that she had not heard from her sons in some time. The BPD did not inform her at this time that her son Birendra was dead or that her son Surendra had been taken into police custody by the WPD. The BPD simply told her there was nothing they could do to help her find her sons.

120. At this time, Ms. Thakuri had no idea that one of her sons had been killed by a police officer and another was being interrogated by the WPD.

121. Surendra's family finally located him around 4:30 a.m. on August 26, 2018. He told them Birendra had been shot and was likely at a local hospital. He had no idea at that time that his brother was dead.

122. Upon learning from Surendra that Birendra had been shot by a police officer, Ms. Thakuri called the BPD and begged to know where Birendra was. Unbeknownst to her, by that time, the coroner had asked the WPD to conduct a death notification to Ms. Thakuri, but they had not done so.

123.   A WPD officer instead asked the BPD to give the death notification to Ms. Thakuri.

124.   At around 5:00 a.m. on August 26, 2018, Ms. Thakuri was finally informed by the BPD that her son Birendra had been killed by a police officer.  This tragic news sent her into a state of grief, shock, and denial.

**F.     The WPD's Refusal to Implement Basic Measures to Ensure Police Accountability**

125.   There is no video footage of Defendant Bare's fatal shooting of Birendra Thakuri, nor of the encounter leading up to it.

126.   There is no video footage of this incident because the WPD does not use either body cameras or dashboard cameras.

127.   Law enforcement's use of video recording increases transparency for the community, enhances police officer safety, increases trust between the community and their police department, and is important for police officer training.

128.   According to research by the International Association of Chiefs of Police, In-Car Camera Project, done in conjunction with the U.S. Department of Justice's Community Oriented Policing Services, police officers surveyed with in-car cameras reported the following:

> a)  About one third of officers perceived a feeling of increased safety when the in-car camera was in use (only 3% said they felt these cameras hampered safety); and

    b)  When interviewed about how they used the recordings, "an overwhelming majority" of officers interviewed said they review the footage for self-critique and learning.

*See* International Association of Chiefs of Police, *The Impact of Video Evidence on Modern Policing: Research and Best Practices from the IACP Study on In-Car Cameras*, 2003, p. 13.[1]

129.    Other research from the National Institute of Justice found that officers equipped with body cameras report reduced civilian complaints and use-of-force reports relative to officers who were not equipped with body cameras. *See* Anthony Braga, *et al.*, *The Benefits of Body-Worn Cameras: New Findings from a Randomized Controlled Trial at the Las Vegas Metropolitan Police Department*, Final report to the National Institute of Justice, 2013-IJ-CX-0016, September 2017, pp. 10-11.[2] The report continues to say "[t]hese results support the position that [body-worn cameras] may de-escalate aggression or have a 'civilizing' effect on the nature of police-citizen encounters," and "[t]he complaint and use of force reductions associated with placing [body-worn cameras] on police officers may be particularly important for improving police-community relations in impoverished minority neighborhoods." *Id.* This report also found substantial net annual savings to the police department surveyed due to the decrease in complaints. *Id.*

---

[1] Available at: https://www.bja.gov/bwc/pdfs/IACPIn-CarCameraReport.pdf (last accessed on August 21, 2019).
[2] Available at: https://www.ncjrs.gov/pdffiles1/nij/grants/251416.pdf (last accessed on August 21, 2019).

130.    Legislators for the State of Colorado also recognized the importance of body cameras by establishing a fund and a grant program within the state in 2015. The program allows law-enforcement agencies to access federal and other nongovernmental sources of funding to increase their ability to purchase body-worn cameras for more law-enforcement officers. *See* HB 15-1285. The Colorado General Assembly found that "the use of body-worn cameras can ... strengthen individual officer performance and accountability, enhance the overall transparency of a law enforcement agency, and document encounters between the police and the public to assist in investigation and resolution of complaints and officer-involved incidents." *Id.*

131.    Approximately one month ago, citizens initiated a Change.org petition to the City of Westminster demanding that WPD officers be equipped with body cameras and dashboard cameras.

132.    The U.S. Department of Justice and other nongovernmental organizations offer grants to police departments to purchase body cameras.

133.    Body cameras and dashboard cameras are technologies readily available and commonly used by law-enforcement agencies across the Front Range.

134.    On information and belief, the WPD has not even considered using body cameras or dashboard cameras, evidencing deliberate indifference to community safety.

**G.** **The WPD's Pattern of Using Excessive Force and Disproportionately Shooting Civilians.**

135. Excessive force by WPD officers against civilians is not new.

136. In 2018, two WPD officers were sued for their August 2016 brutal assault of an unarmed Westminster civilian, an assault that happened to be caught on the civilian's own camera. The WPD stated that it had investigated and found the officers acted within WPD policy when, in executing a warrant dressed in plain clothes, they approached an unarmed civilian from behind and immediately attacked him.[3] On information and belief, at least one defendant WPD officer in that suit had previous citizen complaints of police brutality levied against him before the assault that was the subject of that lawsuit.

137. From 2016 to 2018, WPD officers shot 10 civilians. Of those 10 shootings of civilians by the WPD, 9 were fatal.

138. During a six-month period in summer/fall 2018, when Birendra was killed, the WPD's rate of shooting civilians rose dramatically. From April to September 2018, WPD police officers shot and killed 4 civilians (including Birendra Thakuri). That is 14.7 times the national rate for fatal shootings of civilians by law-enforcement officers.

---

[3] Footage of this video can be found at: https://denver.cbslocal.com/2018/02/02/tattoo-shop-police-brutality-lawsuit/ (last accessed on August 21, 2019). The lawsuit was *Martinez v. Holton, et al.*, U.S. District Court for the District of Colorado Civil Action No. 18-cv-00265.

139. In 2018, the rate by which officers of the WPD fatally shot civilians in Westminster was approximately 5 times as high as the rate by which officers of the Denver Police Department fatally shot civilians in Denver.

140. Indeed, on WPD dispatch radio calls regarding Birendra's shooting, when a WPD official was alerted to this officer-involved shooting, she responded, "Oh my gosh! Make it stop!"

141. On January 10, 2019, an off-duty WPD officer shot and wounded a man. No WPD footage exists of this shooting.

142. On April 26, 2019, a WPD officer shot and killed a man. No WPD footage exists of this fatal shooting.

## H. The WPD's Failure to Train and Supervise Its Officers Regarding Proper Use of Force

143. Police officers should be trained that an officer may use deadly force to protect oneself or others only when the officer has the *objective and reasonable belief* that he, or another, is in *imminent danger of death or serious physical injury* based upon the *totality of the facts* known to the officer at the time, or if there is a reasonable necessity for the deadly force. A reasonable necessity for deadly force means that delay in apprehension would create substantial and unreasonable risk to officers or others, resulting in serious physical injury or death.

144. According to Campaign Zero (an organization that advocates for research-informed policing best practices to minimize police violence)—synthesizing previous

scholarship on this issue (*e.g.*, Garrett, Brandon L. and Stoughton, Seth W., *A Tactical Fourth Amendment*, Virginia Law Review, Vol. 103, 211, March 25, 2016[4]) (conducting "an empirical analysis of the force policies of the 50 largest policing agencies in the U.S., and [finding] that many agencies lacked guidance on key subjects, such as the need to provide verbal warnings before using force, and "identifying a consistent approach among prominent agencies that adopt detailed policies incorporating tactical methods to de-escalate")) as well as recommendations from recent U.S. Department of Justice consent decrees and police-reform groups—the presence of eight specific provisions in police use-of-force policies predict lower rates of police-involved killings among police departments with them in place. These eight use-of-force policy restrictions are:

a)    requiring de-escalation;

b)    implementing a use-of-force continuum;

c)    banning choke and strangleholds;

d)    requiring warning before shooting;

e)    restricting shooting at moving vehicle;

f)    requiring exhaustion of all other means before shooting;

g)    mandating a duty to intervene; and

h)    requiring comprehensive reporting.

---

[4] Available at https://ssrn.com/abstract=2754759 (last accessed August 21, 2019).

145.    The study found the number of these use-of-force policy restrictions adopted by police departments is a significant and influential factor in predicting the number of people killed by these departments.[5]

146.    Contrary to this research and best practices, the WPD use-of-force policy does not require officers to de-escalate situations, when possible, before using force.

147.    Contrary to this research and best practices, the WPD use-of-force policy does not restrict chokeholds and strangleholds (including carotid restraints) to situations where deadly force is authorized or prohibiting them altogether.

148.    Contrary to this research and best practices, the WPD use-of-force policy does not require officers to give a verbal warning, when possible, before using deadly force.

149.    Contrary to this research and best practices, the WPD use-of-force policy does not prohibit officers from shooting at people in moving vehicles unless the person poses a deadly threat by means other than the vehicle (for example, shooting at people from the vehicle).

150.    Contrary to this research and best practices, the WPD use-of-force policy does not require officers to exhaust all other reasonable alternatives before resorting to using deadly force.

---

[5] *See* Samuel Sinyangwe, *Examining the Role of Use of Force Policies in Ending Police Violence*, September 2016, available at: https://useofforceproject.org/s/Use-of-Force-Study.pdf (last accessed August 21, 2019).

151.    Contrary to this research and best practices, the WPD use-of-force policy does not require officers to intervene to stop another officer from using excessive force.

152.    Contrary to this research and best practices, the WPD use-of-force policy does not require officers to report both uses of force and threats/attempted uses of force (comprehensive reporting) (*e.g.*, reporting instances where an officer intentionally points a firearm at a civilian).

153.    Police officers are trained on the principle "cover + distance = time." Officers are trained to make tactical moves, like using a patrol vehicle as a barrier, to give other officers time to respond in escalating situations.

154.    Before Defendant Bare shot Birendra Thakuri, he failed to attempt to speak with Birendra, failed to attempt to use his vehicle to de-escalate and create distance, and failed to deploy his two other less lethal weapons on Birendra.

155.    Defendant Bare utterly failed to exhaust other reasonable alternatives before he resorted to deadly force.

156.    On information and belief, Defendant Bare received no discipline from the WPD for his fatal shooting of Birendra.

**I.    The WPD's Failure to Train and Supervise Its Officers Regarding Reasonable Accommodations for Individuals Who are Mentally Disabled**

157.    Police officers should be trained that the prevalence of mental-health problems in the individuals they interact with as a part of their duties is very high.

158.    Thus, police officers should be trained that in every interaction they should:

a) Look for and recognize abnormal behavior, such as: extremely inappropriate behavior for a given context, frustration in new or unforeseen circumstances, inappropriate or aggressive behavior in dealing with the situation, and delusions;

b) Assess risk, by considering, for example: the availability of weapons, signs of lack of control such as extreme agitation, wide eyes, clutching oneself, and the totality of circumstances requiring their presence and overall need for intervention; and

c) Respond accordingly, if the officer determines that they need to intervene.[6]

159.    If a law-enforcement intervention is required for someone experiencing a mental-health crisis, police officers are trained that the following responses, among others, should be considered:

a) Request a backup officer and/or assistance from individuals with specialized training in dealing with mental illness or crisis situations;

b) Take steps to calm the situation;

c) Create increased distance, if possible, in order to provide the officer with additional time to assess the need for force options;

d) Utilize environmental controls, such as cover, concealment, and barriers, to help manage the volatility of situations;

e) Move slowly, and do not excite the individual. Provide reassurance that officers are there to help and that the individual will be provided with appropriate care;

f) Ask the individual's name;

---

[6] *See* International Association of Chiefs of Police: Law Enforcement Policy Center, *Model Policy: Responding to Persons Experiencing a Mental Health Crisis, Section IV* (August 2018).

g) Communicate with the individual in an attempt to determine what is bothering them. If possible, speak slowly and use a low tone of voice. Relate concern for the individual's feelings and allow the individual to express feelings without judgment.[7]

160. These basic protocols are taught to police officers to help lessen the chance that interactions with mentally ill individuals will result in unnecessary violence.

161. WPD's Mental Health Emergency Services policy says that when responding to situations involving individuals who officers reasonably believe to be affected by mental illness or in crisis, "the goal shall be to de-escalate the situation safely for all individuals involved when reasonable, practical, and consistent with established safety priorities." WPD Policy 301.23 at 1. This policy defines mental health as a person's "emotional, physical, mental, or behavioral response to an event or experience that results in trauma. Symptoms may include ... emotional reactions such as fear, anger ... psychological impairments such as inability to focus, confusion, nightmares, and potentially even psychosis ... and/or behavioral reactions including the trigger of a 'fight or flight' response." *Id*. The policy provides that officers should first recognize "behavior that is indicative of mental illness" like "[s]trong and unrelenting fear of persons, places or things," "[i]nappropriate behavior," "easily frustrated," "inappropriate or aggressive behavior," "paranoia," "impairment of thought process," or "extreme fright." *Id*. at 2-3.

---

[7] *Id*.

162.   Despite this policy, on information and belief, the WPD's training on this policy was inadequate.

163.   From the outset of Defendant Bare's encounter with the Thakuri brothers, Birendra was exhibiting multiple types of behavior indicative of mental illness.

164.   According to Defendant Bare, as Birendra approached him the first time, "it occurred to [him] that [Birendra] was emotionally disturbed."

165.   On information and belief, Defendant Bare knew that Birendra was suffering from a mental-health crisis and was mentally disabled based on the fact that Birendra matched the description of the individual on the ATL.

166.   On information and belief, Defendant Bare also knew that Birendra was suffering from a mental-health crisis and was mentally disabled based solely on his interaction with Birendra.

167.   On information and belief, Defendant Bare regarded Birendra as having a mental disability.

168.   Nonetheless, Defendant Bare did nothing to reasonably accommodate Birendra because of his disability.

169.   Defendant Bare could have (i) called someone who was trained to interact with citizens having a mental-health crisis; (ii) spoken calmly to Birendra; (iii) spoken to Surendra about Birendra's behavior; (iv) calmly explained what was happening (that he was investigating a call about a fight); (v) generally de-escalated the situation rather than

creating a volatile environment; (vi) put additional distance and/or a physical barrier between himself and Birendra by getting into his car or walking around to the other side of his car; and (vii) if force was necessary, used the several non-lethal options available to him.

170. These simple accommodations should have been made for the entirety of the interaction. The need for these accommodations became more apparent as Birendra continued to show inexplicable behavior that were symptomatic of a significant mental-health problem.

171. Defendant Bare made no attempt to make such accommodations for Birendra.

172. Because of this failure to accommodate, Birendra was denied the benefit of proper police protection and suffered much greater injury and indignity than citizens without disabilities in his situation would have faced.

173. Indeed, Birendra's erratic actions—including his pacing towards and away from Defendant Bare—were symptomatic of his disability such that Defendant Bare killed Birendra because of his disability.

174. WPD officers should have been properly trained to determine when a person's behavior likely indicates a mental-health crisis.

175. When such a crisis is occurring—such as when a man is acting "emotionally disturbed" for no apparent reason, screaming, slapping his head, repeatedly

approaching an officer, flailing his arms, and otherwise acting "weird"—officers should have the necessary skills to determine appropriate techniques and response options so that the situation may be resolved in a constructive, safe, and humane manner.

176.    Police encounters with mentally ill individuals are commonplace and well known in the law-enforcement community.  According to Michael Woody, former police officer and president of Crisis Intervention Team International, 10% of calls to law enforcement involve someone with a mental illness.[8]

177.    Had Defendant Bare been properly trained to and then actually taken the steps necessary to respond appropriately to Birendra's behaviors that were symptomatic of his disability, Defendant Bare would have conducted his investigation without force.

178.    And had Defendant Bare been properly trained to and then actually taken the steps necessary to respond appropriately to Birendra's behaviors that were symptomatic of his disability, Defendant Bare would not have exacerbated the crisis and behaviors related to Birendra's disability by creating a volatile environment and failing to take any actions to de-escalate the situation, such as simply speaking to the brothers.

179.    On information and belief, Defendant Bare was not disciplined for his failure to accommodate Birendra's disability.

---

[8] *See* National Public Radio, *When Cop Calls Involve The Mentally Ill, Training Is Key*, June 14, 2014, available at https://www.npr.org/2014/06/14/322008371/when-cop-calls-involve-the-mentally-ill-training-is-key (last accessed on August 23, 2019).

**J.      The Aftermath of the Death of Birendra Thakuri**

180.    Sanu Thakuri is a single mother who worked tirelessly for years to achieve the American Dream and provide opportunities for her sons to grow and thrive in the United States.  As a result of the loss of her beloved youngest son, Birendra, when he was only 27 years old, she will never be the same again.

181.    When Defendant Bare shot and killed his younger brother Birendra, Surendra Thakuri lost his only brother and best friend.

182.    Since the shooting, Ms. Thakuri has had to cut back on her work hours because there are times during her job when she breaks down inconsolably, thinking about the crushing fact that Birendra will never walk through her front door again. Birendra will never help her make dinner again or join her on a trip to Nepal to help the children in the orphanage they have supported for years.



183.    Birendra's life was taken before he had a chance to marry and start a family of his own.

184.    The Thakuri family has been irreparably harmed by the unreasonable and unjustified homicide of Birendra.

185.    And the Colorado community was robbed of Birendra's gifts and contributions, as well.  Birendra will never again be able to lead a fundraiser for orphaned children, he will never be able to brighten the day of his fellow church members, and he will never be able to fulfill his dream of starting his own business.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Excessive Force (Survival Claim)
### Violation of the Fourth Amendment Through Fourteenth Amendment
### (against Defendant Bare)

186.    The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

187.    The Estate brings this claim against Defendant Bare.

188.    At all times relevant to this claim, Defendant Bare was acting under the color of state law in his capacity as a WPD officer.

189.    The decedent Birendra Thakuri[9] had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizures through excessive force, including excessive deadly force.

190.    Defendant Bare seized Mr. Thakuri when he shot him, causing Mr. Thakuri to collapse to the ground.

---

[9] References to "Mr. Thakuri" in the remainder of this Complaint refer to the decedent Birendra Thakuri and not his brother, Surendra Thakuri.

191. Defendant Bare's shooting of Mr. Thakuri was the excessive use of deadly force.

192. At all times relevant to this claim, it was clearly established that a law-enforcement officer cannot use deadly force against an individual unless that individual poses an objectively reasonable risk of imminent serious bodily injury or death to the officer or others.

193. Any reasonable law-enforcement officer knew or should have known of this clearly established right at the time of Mr. Thakuri's death.

194. When Defendant Bare fired his fatal shot, Mr. Thakuri did not pose an objectively reasonable risk of imminent serious bodily injury or death to Defendant Bare or others. Mr. Thakuri was unarmed. Defendant Bare shot him from a distance of approximately ten feet away. And it would not be objectively reasonable to believe Mr. Thakuri posed a risk of causing imminent serious bodily injury or death to Defendant Bare without any weapon, especially given that Defendant Bare himself possessed multiple weapons other than his gun, including his flashlight, his OC spray, and his taser.

195. Defendant Bare's use of deadly force to fatally shoot Mr. Thakuri was objectively unreasonable.

196. In the alternative, to the extent that Defendant Bare could be deemed to have perceived that Mr. Thakuri posed a risk of serious bodily injury or death that was objectively reasonable, Defendant Bare created that danger, and thus any need for deadly

force, through his own reckless and deliberate conduct that immediately preceded his use of excessive deadly force.

197. By unnecessarily rushing into a volatile situation alone, without backup, thereby creating the prospect of a two-on-one encounter, and by failing to take any reasonable steps to de-escalate the situation or remove himself from it, Defendant Bare was solely responsible for any danger the situation presented.

198. Defendant Bare's actions, as described herein, were undertaken intentionally, maliciously, and/or in reckless disregard of Mr. Thakuri's federally protected rights.

199. Defendant Bare engaged in the acts and omissions described herein pursuant to the customs, policies, procedures, and practices of the WPD, which encouraged, tolerated, and ratified the use of deadly excessive force and deprivation of constitutionally-protected interests by law-enforcement officers.

200. The acts or omissions of Defendant Bare were a legal and proximate cause of Mr. Thakuri's death.

201. Defendant Bare's actions and omissions caused Mr. Thakuri damages in that he suffered extreme physical and mental pain as a result of being shot in the chest before he ultimately died later that evening.

202.    As a direct result of Defendant Bare's unlawful use of deadly excessive force, Mr. Thakuri's Estate and heirs have suffered actual physical, emotional, and economic injuries in amounts to be determined at trial.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Deliberately Indifferent Policies, Practices, Customs, Training, Supervision, and Ratification (Survival Claim) Violation of the Fourth Amendment Through the Fourteenth Amendment (against Defendant City of Westminster)

203.    The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

204.    The Estate brings this claim against Defendant City of Westminster.

205.    At all times relevant to this claim, Defendant Westminster failed to properly train, supervise, monitor, and discipline employees regarding the use of excessive force (including deadly force) and proper procedures when encountering individuals in the midst of mental-health crises.

206.    At all times relevant to this claim, Defendant Westminster maintained policies, customs, and practices of failing to properly train, supervise, and discipline its officers in a manner amounting to deliberate indifference with respect to excessive force (including deadly force) and proper procedures when encountering individuals in the midst of mental-health crises, including with respect to obviously recurring situations faced by police such as police-citizen encounters and determining whether an individual is suffering from mental-health issues.

207. Defendant Westminster's policies, customs, and practices, and failure to properly train, supervise, and/or discipline its officers included the failure to train officers on avoiding the reckless and deliberate creation of the need to use force.

208. Defendant Bare's use of deadly force against Mr. Thakuri arose under circumstances that constitute a usual and recurring situation with which police officers must deal, particularly interacting with the public while on patrol.

209. The violations of Mr. Thakuri's constitutional rights were a foreseeable consequence of Defendant Westminster's actions and inactions.

210. Defendant Westminster was deliberately indifferent to the constitutional rights of its citizens, by failing to properly train, supervise, and discipline Defendant Bare with respect to the use of excessive force. Defendant Westminster could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees, including Defendant Bare. Instead, Defendant Westminster failed to adequately train Defendant Bare and, even if it did provide the necessary training, it did not discipline him for using excessive force or failing to accommodate an individual with a disability.

211. Defendant Westminster's policies, customs, and/or practices and failure to properly train and supervise its employees, including Defendant Bare, were the moving force and proximate cause of the violation of Mr. Thakuri's constitutional rights.

212.     Defendant Westminster's acts and omissions caused the Estate's damages and deprived the decedent of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 12133 - Title II of the Americans with Disabilities Act (Survival Claim)**
**(against Defendant City of Westminster)**

213.     The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

214.     The Estate brings this claim against Defendant City of Westminster.

215.     Mr. Thakuri was an individual with a disability. He had been diagnosed with bipolar disorder. And during the fatal August 25, 2018 police encounter that led to his death, Defendant Bare regarded Mr. Thakuri as an individual with a mental disability.

216.     Under Title II of the ADA, each state and local government and each agency of such a government is obligated to evaluate its current services, policies, and practices, and their effects, that do not or may not meet the requirements of Title II of the ADA, and if modification of services, policies, and practices is needed to achieve compliance, make the necessary modifications.

217.     To assure compliance with the ADA, local and state governments should conduct training of their employees. In that way, each state and locality and each instrumentality of such a state or locality can assure that individuals with disabilities are provided services in a manner that complies with the ADA.

218.    The WPD did not provide adequate training for its officers in how to interact with mentally disabled individuals experiencing a mental-health crisis.

219.    The failure of Defendant Westminster to properly train Defendant Bare in how to interact with and provide services to mentally disabled individuals experiencing a mental-health crisis violated Title II of the ADA.

220.    Additionally, Defendant Bare violated Mr. Thakuri's rights under Title II of the ADA by excluding him from receiving the benefit of proper police protection, and subjecting him to discrimination resulting in his death, both solely because of his mental disability.

221.    At all times relevant to this complaint, Defendant Westminster employed Defendant Bare as a law-enforcement officer and is vicariously liable for his actions under Title II of the ADA.

222.    Defendants Westminster's and Bare's violation of Title II of the ADA proximately caused Mr. Thakuri's death.

223.    Defendants Westminster's and Bare's violations of Title II of the ADA caused Mr. Thakuri to endure severe conscious pain and suffering between the time of the initiation of his encounter with Defendant Bare to his death.

## FOURTH CLAIM FOR RELIEF
## 29 U.S.C. § 794 - Section 504 of the 1973 Rehabilitation Act (Survival Claim)
## (against Defendant City of Westminster)

224.    The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

225.    The Estate brings this claim against Defendant City of Westminster.

226.    On information and belief, at all times relevant to this Complaint, Defendant City of Westminster received federal funding, including funding for the WPD

227.    Under Section 504 of the 1973 Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

228.    Mr. Thakuri was an individual with a disability.  He had been diagnosed with bipolar disorder.  And during the fatal August 25, 2018 police encounter that led to his death, Defendant Bare regarded Mr. Thakuri as an individual with a mental disability.

229.    The WPD did not provide adequate training for its officers in how to interact with mentally disabled individuals experiencing a mental-health crisis.

230.    The failure of Defendant City of Westminster through the WPD to properly train Defendant Bare in how to interact with and provide services to mentally disabled

individuals experiencing a mental-health crisis violated Section 504 of the Rehabilitation Act.

231. Additionally, Defendant Bare violated Mr. Thakuri's rights under Section 504 of the Rehabilitation Act by excluding him from receiving the benefit of proper police protection and subjecting him to discrimination resulting in his death, both solely because of his mental disability.

232. At all times relevant to this complaint, Defendant Westminster employed Defendant Bare as a law-enforcement officer and is vicariously liable for his actions under Section 504 of the Rehabilitation Act.

233. Defendants Westminster's and Bare's violation of Section 504 of the Rehabilitation Act proximately caused Mr. Thakuri's death.

234. Defendants Westminster's and Bare's violations of Section 504 of the Rehabilitation Act caused Mr. Thakuri to sustain severe conscious pain and suffering between from the outset of his encounter with Defendant Bare to his death.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Estate respectfully requests that this Court enter judgment in its favor and against the Defendants, and award it all relief as allowed by law and equity, including, but limited to, the following:

a)      All appropriate relief at law and equity;

b)      Actual economic damages as established at trial;

c)      Compensatory and consequential damages, including, but not limited to, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

d)      Punitive damages for all claims allowed by law in amount to be determined at trial;

e)      Pre-judgment and post-judgment interest at the highest lawful rate;

f)      Attorneys' fees and the costs associated with this action as allowed by law, including expert witness fees; and

g)      Any further relief that this Court deems just and proper, and any other relief as allowed by law.

PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this 23rd day of August 2019.

JOHNSON & KLEIN, PLLC

s/Gail K. Johnson
**Gail K. Johnson**
Eric K. Klein
Aurora L. Randolph
1470 Walnut Street, Suite 101
Boulder, CO 80302
(303) 444-1885
(866) 340-8286 (fax)
gjohnson@johnsonklein.com
eklein@johnsonklein.com
arandolph@johnsonklein.com

ATTORNEYS FOR PLAINTIFF